UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARRY CALAMIA, | : 16 Civ. 6140 (GBD)(JWL) |
| Plaintiff, | : |
| -vs.- | : **SECOND AMENDED** |
| | : **COMPLAINT** |
| DETECTIVE VADIM KONTOROVICH, SERGEANT KIMBERLY SMITH, LIEUTENANT VITO ARDITO, DETECTIVE FREDERIC DAUGHTRY, DESK SERGEANT GEORGE TAYLOR | : |
| Defendants. | : |

## PRELIMINARY STATEMENT

This is a civil rights action filed by Barry Calamia ("Plaintiff" or "Mr. Calamia"), for damages under 42 U.S.C. § 1983. Plaintiff asserts allegations of false arrest and malicious prosecution in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Unfortunately, this is not the first false arrest and malicious prosecution suffered by Plaintiff at the hands of officers of the 63rd Precinct of the New York City Police Department ("NYPD"). Plaintiff has been the victim of two false arrests by the NYPD; the first was settled in 2011 for $17,500.00. In 2015, under similarly malicious circumstances, officers of the NYPD did it again, despite the complete recant of the only witness to the alleged crime. Any probable cause the officers had dissipated, yet after eleven (11) attempts to arrest Plaintiff, the officers could not let it go. Instead of abandoning the false charges, the officers not only arrested Mr. Calamia, but participated in his malicious prosecution.. Defendants lacked probable cause both at the point of arrest and prosecution and maliciously violated Mr. Calamia's Constitutionally-

protected rights. Defendants also used excessive force in applying handcuffs to Mr. Calamia and refusing his repeated requests to loosen them, causing him physical pain and suffering.

## JURISDICTION

1. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(3) and (4).

2. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims that form part of the same case and controversy as against all parties within the original jurisdiction of this Court.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PROCEDURAL REQUISITES

4. Plaintiff filed a Notice of Claim with Defendant City of New York pursuant to General Municipal Law § 50-e, within ninety (90) days of the events complained of herein, a copy of which is attached hereto.

5. All conditions precedent to filing this cause of action have been met.

## THE PARTIES

6. Plaintiff, Barry Calamia, is and was a citizen and resident of the City of New York and the State of New York.

7. Mr. Calamia is a self-employed antiques dealer in Brooklyn who has lived in the same home for decades.

### Defendants and State Actors

8. City of New York ("NYC") is and was a municipal entity created and duly incorporated and existing pursuant to the laws of the State of New York.

9. New York City Police Department ("NYPD") is an organization authorized by the laws of the City of New York.

10. Defendant Detective Vadim Kontorovich was an employee of the NYPD assigned to the 63rd Precinct at the time of the allegations of the instant action.

11. Defendant Sergeant Kimberly Smith was an employee of the NYPD assigned to the 63rd Precinct at the time of the allegations of the instant action.

12. Defendant Lieutenant Vito Ardito was an employee of the NYPD assigned to the 63rd Precinct at the time of the allegations of the instant action.

13. Defendant Detective Frederic Daughtry was an employee of the NYPD assigned to the 63rd Precinct at the time of the allegations of the instant action.

14. Defendant Sergeant Taylor was the desk sergeant at the 63rd Precinct on August 5, 2015 when Plaintiff was brought in right after his arrest.

15. Kings County District Attorney's Office ("DA") is an agency of Defendant NYC, responsible for the prosecution of criminal law violations.

16. Assistant District Attorney ("ADA") Sherman Jones was at all relevant times an ADA in the Kings County District Attorney's Office.

17. ADA John Doe was at all relevant times an Assistant District Attorney in the Kings County District Attorney's Office.

**Background Facts Related To False Arrest #1**

18. In October 26 of 2010, Plaintiff and Ms. Drapinski got in an argument in his home.

19. Ms. Drapinski had been drinking heavily.

20. She attacked Mr. Calamia, yet when the police arrived, she feigned that he was the aggressor.

21. Despite her drunken stupor, the police who responded from the 63rd Precinct arrested Mr. Calamia.

22. The City later settled Mr. Calamia's potential claims for false arrest and malicious prosecution for $17,500.00.

**ALLEGATIONS**

23. On January 17, 2015, police were called to the King's County Hospital by medical staff.

24. Irene Drapinski ("Drapinski") was present in the emergency room with lacerations and bruising on her head, back and ribs.

25. Drapinski tested positive for cocaine and benzo and was extremely high.

26. The hospital staff recorded that she did not lose consciousness but was unclear about the source of her injuries.

27. She told conflicting stories to emergency medical personnel including that she had been in a motor vehicle accident, that a boyfriend had pushed her down the stairs and that a boyfriend assaulted her.

28. Officer Pasiecznik and Sergeant McCormack of the 63rd precinct of the NYPD responded to the hospital.

29. The officers allegedly took a statement from Ms. Drapinski in which she allegedly stated that Plaintiff assaulted her.

30. The Defendants claim they did not get a signed statement from Ms. Drapinski "due to her injuries."

31. Ms. Drapinski did not have any injuries impacting her ability to sign; in reality she was too high to sign.

32. The only offense listed on the "Domestic Incident Report" filled out by Officer Pasciecznik was "Assault 3."

33. On January 22, 2015 Police Officer Joaquin Bonilla ("Bonilla"), Detective Vadim Kontorovich ("Kontorovich") and Police Officer Tiffany Ortiz ("Ortiz") visited Plaintiff's home for a "home visit."

34. On January 25, 2015, Detective Frederic Daughtry ("Daughtry") made an unsuccessful attempt to call Ms. Drapinski to interview her. He left a message for her.

35. On January 29, 2015, Daughtry conferred with Police Officer Bonilla.

36. On January 30, 2015 Daughtry again tried to contact Ms. Drapinski and left a message.

37. Bonilla attempted an unsuccessful "home visit" to visit Drapinski at the address she had given detectives which was also Plaintiff's home.

38. On January 30, 2015, Daughtry again tried to reach Drapinski and left a message on her cell phone.

39. On February 1, 2015, Daughtry reached Drapinski, who stated that she did not remember the incident and that the Plaintiff did not assault her. She also told Daughtry that she had moved to Chicago.

40. Ms. Drapinski had, in fact, moved to Chicago.

41. Daughtry noted that she was "highly uncooperative."

42. Despite Drapinski's recant, on February 6, Kontorovich and Bonilla visited Mr. Calamia's home in hopes of apprehending him.

43. On February 19, Kontorovich and Sergeant Sperrazza ("Sperrazza") visited the home. No one was there.

44. On March 16, 2015 Bonilla and Police Officer JeanBaptiste ("JeanBaptiste") visited Plaintiff's home. No one was there.

45. On March 18, 2015 Daughtry reviewed the domestic violence history of the parties, which revealed that Plaintiff had been arrested for the 2010 incident in which Ms. Drapinski claimed Plaintiff bit her finger.

46. Plaintiff's arrest record for the 2010 arrest had the words "SEALED' typed in red in several prominent places on the arrest documents.

47. NYPD records are marked "SEALED" in few limited circumstances – arrests that resulted in acquittals or dismissed charges, or arrests that occurred when the arrestee was a minor.

48. Daughtry then did an Order of Protection search which showed an Order of Protection had been issued at the time of the 2010 false arrest and had expired.

49. Daughtry consequently requested the case be re-closed pending the Icard "hit" for Plaintiff.

50. The NYPD system generated an "Auto Reopen" of the case on April 8, 2015.

51. Daughtry did not conduct any further investigations. On April 16, 2015, Daughtry again requested the case be reclosed.

52. On April 28, 2018 Ortiz and Bonilla visited Plaintiff's home. No one was home.

53. On May 19, 2015 the NYPD computer system generated another "Auto Reopen" of the case.

54. Bizzarely, on May 25, 2015 police from the 63rd Precinct went to Mr. Calamia's residence because Ms. Drapinski was there and very grumpy because Mr. Calamia would not let her enter.

55. Mr. Calamia let her in and the police left with no additional note.

56. Officers Bonilla and Smith reviewed the visit record.

57. On May 26, 2015 Ortiz and Bonilla once again tried to visit the home. Again, no one was present.

58. On the evening of May 26, 2015, the police were again called to Mr. Calamia's residence because Ms. Drapinski was "intoxicated" and wanted entry.

59. Mr. Calamia again let her in after the police arrived and they left without incident.

60. Again, Officers Bonilla and Smith reviewed the police report.

61. Mr. Calamia had no reason to believe the NYPD were trying to arrest him, nor that there were any charges pending. The NYPD had literally been to his home twice in two days due to Ms. Drapinski's drunken antics and left without event.

62. On June 11, 2015 Ortiz, Bonilla and Smith visited Plaintiff's home. No one was home.

63. On June 18, 2015 the NYPD computer system generated another "Auto Reopen" of the case.

64. On June 24, 2015 Ortiz and Smith returned to Plaintiff's house yet again. No one was home.

65. On July 7, 2015 Bonilla, Kontorovich, Ortiz and Ardito all together visited the property. No one was home.

66. On August 5, 2015 Kontorovich, Smith and Ardito visited the home again at 9:13am. No one answered.

67. Mr. Calamia did not travel nor evade police during this time.

68. In fact, he had no idea the police were looking for him.

69. The NYPD was both vested and frustrated. Despite learning just days after the incident that the complainant was high and completely denied that Mr. Calamia had ever hurt her, they pursued the arrest of Plaintiff.

**False Arrest #2**

70. On the morning of Wednesday, August 5, 2015, Plaintiff was en route to Connecticut for an antiques show. He was driving over the Whitestone Bridge with Ms. Drapinski in his van.

71. Plaintiff received a 'blocked number' telephone call on his cell phone from an officer of the NYPD.

72. The officer informed Plaintiff that the police were outside his home.

73. The Officer told Plaintiff that a car owned by him had been hit by another vehicle and was knocked into the middle of the street. The officer requested that Plaintiff return to his home to get the car out of the street.

74. Plaintiff did own a car parked across the street from his garage and believed the phone call to be credible.

75. However, as Plaintiff was on his way out of town, he requested that the Officer call a tow truck.

76. The Officer refused and insisted that Plaintiff return.

77. Plaintiff agreed to immediately return home after his request to have the car towed was denied.

78. Plaintiff and Ms. Drapinski returned to his home approximately one hour later.

79. Upon his return, Plaintiff saw three police officers on the street near his parked car: two men and one woman.

80. Plaintiff's car was parked precisely where he had left it earlier in the day.

81. Plaintiff left his van running with Ms. Drapinski inside and walked over to the officers.

82. Lieutenant Ardito showed Plaintiff some scratches on the car bumper and Plaintiff insisted that the scratches had been there before.

83. Plaintiff was incredibly confused as his car was not in the street as the officer on the phone had indicated.

84. While Plaintiff was speaking to Lieutenant Ardio, Sergeant Smith approached his van and spoke with Ms. Drapinski.

85. As Plaintiff was speaking with the three male officers, Sergeant Smith returned from the van and said, "she's denying it happened."

86. Sergeant Smith and Detective Kontorovich then approached Ms. Drapinski together.

87. Ms. Drapinksi speaks several Eastern European languages and was able to speak with Detective Kontorovich in his native language. She told both police officers that she could not remember the events of January 17, but she knew that Mr. Calamia had not hurt her.

88. When the officers asked her if the Plaintiff was Mr. Calamia, she did identify him, but insisted that he did not hurt her on January 17, 2015.

89. Lieutenant Ardito asked Plaintiff for identification which he was getting from his pocket.

90. Kontorovich and Smith approached Plaintiff and Ardito again and Kontorovich made a negative statement about Ms. Drapinski's statements.

91. Kontorovich then offered to park Mr. Calamia's van as it was sitting in the street, running.

92. Kontorovich got in the van with Ms. Drapinski and drove her around for several minutes before returning.

93. Ms. Drapinski told Kontorovich several times during the drive that Mr. Calamia had not hurt her in any way.

94. Mr. Calamia believed the officer's presence was due to the 2010 arrest as Kontorovich was so focused on Ms. Drapinski.

95. Plaintiff told the officers, "that happened a long time ago and you guys already had to pay me for that. Nothing happened. I never hurt her."

96. Nonetheless, when Kontorovich returned he told Mr. Calamia that he was under arrest.

97. Mr. Calamia explicitly told the officers that that officers had falsely arrested him before and that it was resolved.

98. Mr. Calamia did not realize the officers were there for anything other than the arrest from 2010.

99. Defendant police officers did not tell Mr. Calamia why he was under arrest.

100. Plaintiff was asked to empty his pockets, revealing several credit cards and cash. Plaintiff was then handcuffed.

101. However, the officers told Mr. Calamia that they did not want to voucher his personal possessions, so he should leave them behind.

102. They uncuffed him so he could open the back door to his home and throw his credit cards and cash inside the house.

103. He gave his house and car keys to Ms. Drapinski.

104. Officer Kontorovich replaced the handcuffs on Plaintiff immediately thereafter.

105. Plaintiff complained to officers Ardito, Kontorovich and Smith that the handcuffs were very tight, cutting into his wrists and causing excruciating pain. Defendant officers ignored Plaintiff's request to loosen his handcuffs.

106. At no time did the Defendant officers tell Plaintiff why he was under arrest.

107. Plaintiff was taken to the 63rd Precinct in the back of a police car.

108. When he arrived at the police precinct he was taken by the officers to the desk sergeant.

109. The officers told Desk Sergeant Taylor that Mr. Calamia had been arrested before and voiced concern that it was the same event.

110. Desk Sergeant Taylor, told them it was not the same event and told them to, "go upstairs and look."

111. Mr. Calamia told the desk sergeant that it was a mistake, that they paid him before because it was a false arrest.

112. Desk Sergeant, Taylor, replied, "well, we'll get the paperwork right this time so we don't have to pay you."

113. Mr. Calamia asked Officer Kontorovich and Desk Sergeant Taylor several times to release his handcuffs as they were biting into his flesh. Neither would release the handcuffs.

114. Plaintiff was fingerprinted, photographed and placed in a small jail cell. He had still not been told why he was under arrest.

115. Mr. Calamia complained to the intake people at the courthouse that his wrists were in severe pain due to the excessive handcuffing.

116. For weeks after his arrest, Mr. Calamia suffered from bruised wrists, swelling, numbness and pain in his wrists and hands.

**Allegations of Malicious Prosecution**

117. Despite knowing that Ms. Drapinski had completely recanted, Kontorovich signed an affidavit supporting Mr. Calamia's arrest and prosecution which declared that Ms. Drapinski informed him that the 'defendant did push the informant causing the information to fall to the ground."

118. In the complaint room of the Brooklyn District Attorney's Office, paralegal Ahmad Ahmed, processed Plaintiff's case.

119. Mr. Ahmed completed the Complaint Room Screening Sheet and noted that there was no Domestic Violence history.

120. Kontorovich told Mr. Ahmed that on the morning of the arrest he "observed [Mr. Calamia] and [Ms. Drapinski] sitting in a vehicle in front of [Mr. Calamia's house]." He omitted that he had lured the couple there with fraudulent phone calls.

121. Mr. Ahmed then called Ms. Drapinski who once again said that Plaintiff had not hurt her or pushed her on January 17, 2015.

122. Mr. Ahmed noted that at the "ECAB [Early Case Assessment Bureau]" the victim had recanted and said she fell.

123. Nonetheless, the District Attorney's Office pursued the prosecution.

124. Plaintiff was assigned counsel, Alyssa Perrone, Esq., to serve as his public defender through Brooklyn Defender Services.

125. Plaintiff only discovered that he had been arrested under charges of Assault in the Third Degree, Menacing in the Third Degree and Harassment in the Second Degree when he was arraigned in front of Judge Joy Campanelli on August 6, 2015.

126. Judge Campanelli released Plaintiff on his own recognizance and set a return date on the assault charge docketed as *People v. Barry Calamia*, 2015 KN050807.

127. During the appearance, the ADA Sherman Jones attempted to gain a full protective order against Mr. Calamia, demanding he stay away from Ms. Drapinski.

128. Alyssa Perrone explained to the Judge that Ms. Drapinski had his house keys and this was not feasible.

129. The protective order was edited and merely stated that Mr. Calamia should not commit crimes against Ms. Drapinski.

130. Ms. Perrone was told by ADA Sherman Jones that Brady material existed and Ms. Drapinski had recanted and said she, "fell," on the night of January 17, 2015.

131. Regardless of ADA Sherman Jone's knowledge of Ms. Drapinski's recantation, Mr. Calamia had to return to court on November 5, 2015.

132. The case was once again adjourned because the District Attorney's Office had no evidence with which to prosecute him.

133. Mr. Calamia had to close his business for the day and deal with the considerable consternation of having pending criminal charges against him.

134. On November 5, 2015, Mr. Calamia had to appear in front of Judge Antignani again, missing work and life yet again.

135. This time ADA John Doe conceded on 30.30 and dismissed the case because continued prosecution would have infringed on Mr. Calamia's right to a speedy trial.

136. After spending more than 24 hours in the custody of the NYPD and being forced to appear in Court with an attorney on three occasions to contest the assault charges, ADA John Doe dropped all charges and the case was dismissed on November 5, 2016.

### AS AND FOR A FIRST COUNT
### against Defendants Kontorovich, Smith, Ardito, Daughtry and Desk Sergeant Taylor
### (42 U.S. § 1983 – Fourth Amendment, False Arrest)

137. Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs and incorporates each as though fully realleged herein.

138. Defendants Daughtry, Kontorovich, Smith, Ardito and Taylor are employees of the NYPD and perform their duties under color of law.

139. As a result of the actions of Daughtry, Kontorovich, Smith, Ardito and Taylor's falsely arresting Plaintiff and their subsequent failure to correct such actions, Plaintiff suffered physical harm, emotional distress from humiliation and damage to his reputation.

140. There was never probable cause for the arrest as Ms. Drapinski recanted the first time she was contacted by the NYPD.

141. Ms. Drapinski thereafter repeatedly recanted.

142. Probable cause dissipated between January 22, 2015 and August 5, 2015.

143. A reasonable officer in the position of the Defendants would have investigated the sealed arrest records from the 2010 false arrest and alleged domestic violence incident.

144. The officers also had records of Ms. Drapinski's drunken fits on at least two occasions after January 22, 2015 and the August 5, 2015 arrest of Mr. Calamia and did not use reasonable investigation to look into the incidents.

145. Consequently, Plaintiff's false arrest resulted in a violation of his Fourth Amendment rights.

### AS AND FOR A SECOND COUNT
### against Defendant Kontorovich
### (42 U.S.C. § 1983, Malicious Prosecution)

146. Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs and incorporates each as though fully realleged herein.

147. Kontorovich signed an affidavit in support of Plaintiff's prosecution which he knew to be false.

148. Even after the alleged victim recanted at the early case assessment bureau, ADA Sherman Jones failed to take action to correct Plaintiff's unlawful detention causing him physical, emotional and financial harm.

149. Despite knowing that the victim had recanted, the Assistant District Attorneys required Plaintiff to make two appearances with an attorney in Court prior to the Court's dismissal of all charges, further causing Plaintiff emotional and financial harm.

150. As a result of the actions of the actions of Kontorovich Plaintiff's rights under the Fourth Amendment were violated.

### AS AND FOR A THIRD COUNT
### against Defendants Kontorovich, Smith, Ardito and Taylor
### (42 U.S.C. § 1983, Excessive Force, Handcuffing)

151. Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs and incorporates each as though fully realleged herein.

152. After Kontrovich applied the handcuffs to Plaintiff at his home, he was released from them in order to open the back door to his home and drop belongings inside.

153.   When the handcuffs were reapplied they were incredibly tight and extremely painful.

154.   Mr. Calamia repeated requested of Kontrovich, Smith and Ardito that they loosen the handcuffs due to the pain they were causing.

155.   When Mr. Calamia reached the precinct and was presented to Desk Sergeant Taylor, he also requested of Kontrovich, Smith, Ardito and Desk Sergeant Taylor that they loosen his handcuffs due to the pain they were causing.

156.   All Defendants that Mr. Calamia asked, refused to loosen his handcuffs causing him great pain, bruising, swelling and numbness in his wrists and hands for weeks thereafter.

## PRAYERS FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court grant the following relief against Defendants

a.   Award Plaintiff Barry Calamia compensatory damages for his injuries, including garden variety emotional damages;

b.   Award Plaintiff Barry Calamia punitive damages against all Defendants;

c.   Award Plaintiff's reasonable attorneys' fees, together with the costs of this action in accordance with 42 U.S.C. §1988;

d.   Grant Plaintiff Barry Calamia such other relief as the court may deem proper.

Dated: September 11, 2018
       New York, New York

                                            LAW OFFICE OF AMY JANE AGNEW, P.C.

                                            By: _____
                                                      Amy Jane Agnew, Esq.

                                                 24 Fifth Avenue, Suite 1701
                                                 New York, New York 10011
                                                          aj@ajgnewlaw.com
                                                              (973)600-1724

                                                          *Attorney for Plaintiff*